

$\mathcal{F}$*reeman* & $\mathcal{P}$*atel* LLC

Jarred S. Freeman**
Hamill Patel**
Kiran A. Freeman*
Of Counsel:

**3840 Park Avenue - Suite 202-A
Edison, NJ 08820**
[freemanandpatel.com](freemanandpatel.com)

Tel: 732-494-7900
Fax: 732-494-7904

[jarred@freemanandpatel.com](jarred@freemanandpatel.com)
[info@freemanandpatel.com](info@freemanandpatel.com)

**Member of NJ & NY Bar
*Member of NJ Bar**

March 14, 2025

Clerk of the Court
U.S. District Court
Newark, N.J.     07102          VIA ECF ONLY

Re:   <u>MILLER; ET AL. v. DEMATTIA; ET AL.</u>
      DOCKET No. 24-cv-4328 (MCA; AME)

      PLAINTIFF NAEEM MILLER'S ANSWER IN
      OPPOSITION TO RULE 12(b)(6) MOTION OF
      DEFENDANTS CITY OF NEWARK AND
      <u>MUHAMMAD TO DISMISS THE COMPLAINT</u>

      [RETURNABLE MARCH 24, 2025;

      ORAL ARGUMENT REQUESTED]

Dear Clerk of the Court:

    In lieu of formal brief please accept the within letter-memorandum as the

answer of Plaintiff NAEEM MILLER ("plaintiff" or "Mr. Miller") opposing the

Rule 12(B)(6) [1] motion of defendants CITY OF NEWARK and  MURAD

---

[1]      All Rule references, unless otherwise noted, refer to the Federal Rules of
Civil Procedure.

MUHAMMAD ("defendants"), dated January 31, 2025 (ECF no. 32) ("motion")

for an order dismissing with prejudice the complaint as against the defendants.

Defendants' motion is supported by their letter-brief dated January 31, 2025.

("DBr.").

PRELIMINARY STATEMENT [2]

This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeking

monetary damages for Plaintiff Miller and his immediate family members because

Miller spent over 20 years wrongfully incarcerated based upon a murder charge on

which he was convicted solely due to and based on the defendants' wrongful

suppression and destruction of evidence favorable to Miller and the fabrication of

---

[2]

"Pa____" - refers to a page in the Appendix to the brief; the Appendix TABLE
OF CONTENTS is after page 40 of this Brief, as is the Appendix itself.

1T-trial transcript dated March 21, 2005.
2T-trial transcript dated March 22, 2005.
3T-trial transcript dated March 23, 2005.
4T-trial transcript dated March 29, 2005.
5T -trial transcript dated March 30, 2005.
6T-trial transcript dated March 31, 2005.
7T-trial transcript dated April 1, 2005.
8T-new trial motion transcript dated February 3, 2023.
9T-new trial motion transcript dated February 27,2023.
l0T-new trial motion transcript dated June1,2023(Judge's decision).
    Rather than overwhelm the Court with thousands of pages of transcript
(most of which are irrelevant) plaintiff stands ready to submit any page(s) of
transcript the Court identifies that it wishes to receive.

false evidence prejudicial to Mr. Miller.

Defendant DeMattia was an Assistant Essex County Prosecutor employed by the Essex County Prosecutor's Office and the County of Essex/State of New Jersey, acting within the scope of his authority and under color of State law when he secured the indictment of Miller and then acted as the prosecutor who tried Miller; his participation in the case ended upon Miller being sentenced. Compl. ¶ 21.

Defendant Muhammad was a homicide detective employed by the Newark Police Department acting within the scope of his authority and under color of State law when he was appointed the lead detective assigned to the murder investigation involving Mr. Miller and then appeared and testified against Mr. Miller at his trial. Compl. ¶ 20.[3]

The damages claimed by Miller and his family resulted from the failure of the individual defendants, in violation of their obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972) (collectively "Brady"), for over 20 years to disclose at any time to Miller and the trial Court that the individual defendants had engaged in wrongful suppression and destruction of evidence favorable to Miller and the fabrication of false evidence

---

[3]    Defendant DeMattia and defendant Muhammad are collectively referred to as the "individual defendants."

prejudicial to Mr. Miller. Compl. ¶ 6.

Defendant Muhammad is charged in three counts herein:

Count I - violations of the right to a liberty, due process, and a fair trial under the Fourth, Fifth, Sixth and Fourteenth Amendments;
Count II - malicious prosecution under the Fourth, Fifth and Fourteenth Amendments;
Count III - denial of due process and a fair trial under the Fifth and Fourteenth Amendments.

Defendant City of Newark ("Newark") is charged under Monell v. Dep't of Soc. Services of City of Yew York, 436 U.S. 658, 701 (1978) with failure to properly hire, train, monitor  and educate the City of Newark Police ("NPD"), such as defendant Muhammad, and that there was a systemic failure of the NPD supervisors to monitor/discipline the rank and file police officers, such as defendant Muhammad. Compl.  Count IV.

In June 2023 Miller's conviction was vacated on the basis that discoverable *Brady* evidence material and favorable to Miller had been wrongfully, deliberately and in bad faith suppressed by DeMattia, but not until Miller had endured the trauma of his prosecution, conviction and, most importantly, his having served over twenty years in state prison custody.. See Pa8-Pa10; see also State v. Miller, 2024 N.J. Super. LEXUS 548 (April 03, 2024).

COUNTERSTATEMENT OF FACTS

<u>Miller's Indictment, Trial and Sentencing</u> [4]

The criminal case involves the shooting and murder of a Timothy Philips, and the wounding of a Stacey Davis in Newark, New Jersey in the early morning hours of December 16, 2001. In addition to the murder of Mr. Philips at that time and place, a second person was wounded by gunfire (presumably aimed at Mr. Philips but which was misdirected) wounding a second victim, Mr. Stacey Davis.

Soon after the Philips murder and the wounding of Mr. Davis occurred the Newark Police Department ("NPD") and Essex County Prosecutor's Office ("ECPO") assigned Newark Detective Murad Muhammad ("Murad") and Investigator Ben Powell ("Powell") as the co-chief detectives on the case to launch an investigation, which resulted in two witnesses being indentified: FELICIA WRIGHT ("Wright") and a STACEY DAVIS ("Davis").

Miller was charged under Essex County Indictment No. 03-05-1830 with the first degree murder of Timothy Phillips, contrary to N.J.S.A. 2C:11-3(a)(2) (count one); second degree aggravated assault of Stacy Davis, contrary to N.J.S.A. 2C:12-1b(1) (count two); third degree unlawful possession of a handgun, contrary to N.J.S.A. 2C:39-5b (count three); and second degree possession of a handgun, with

---

[4]    The citations as to the factual events underlying the investigation, prosecution and trial of Mr. Miller are taken from the unpublished opinion in <u>State v. Miller</u>, supra.

a purpose to use it unlawfully against the person of another, contrary to N.J.S.A. 2C:39-4a (count four). Pa01-Pa05.

During and in relation to the criminal trial of Mr. Miller, Mr. DeMattia presented two alleged eyewitnesses: Wright and Davis.

Soon after the Phillips murder Mr. Davis was interviewed several times by Det. Muhammad and shown a photo array containing Mr. Miller's photo; Davis initially denied the picture of the Mr. Miller was the shooter, but on being shown the third photo array, on a subsequent date, identified Mr. Miller as the person he observed shooting the victim several times. 3T17-19/20; 3T33-14/15.

At trial, however, he recanted this identification saying that "No... that can't be him right there... he just - he don't look the same." referring to Mr. Miller in the courtroom at trial. 4T44-13/25; 4T44-4T45.

The second State's witness produced by Mr. DeMattia is Ms. Felicia Wright, who testified on March 23, 2005. As is relevant herein Ms. Wright stated that she was in Roland's Tavern when a fight involving a Kevin Phillips occurred. When the bar closed, she went to the front door and while exiting she heard six or seven gunshots. She then saw a man, whom she later learned was Timothy Phillips, lying in the street outside of Roland's Tavern; she and Phillips had known each other for years.

Wright also saw several people running from the scene, including Mr.

6

Miller; the man Wright "believed" to be Miller was across the street from her when she quickly saw him.  She did not know where he was coming from, and she estimated that he was about 50 feet away from Timothy Phillips when she first saw him. He then ran to Scheerer Avenue, turned the corner, and was out of Wright's sight.  3T107-16/25; 3T110-9/16.

Wright also testified that she could see a black gun in the man's right hand as he ran, although she acknowledged that she saw him only in profile, and his left side was facing her; she also described the gun as a black automatic.

At trial, Wright also testified that when she saw the man running with the gun, she "believed" but was not 100% sure it was Mr. Miller and she had a doubt that it was Miller. 3T110-22/24; 3T165-7 to 3T166-12.

On his opening Mr. DeMattia promised that during the trial the jury would hear from eye "witnesses who will testify as to the shooting."

Prior to her testifying DeMattia, at a side-bar, characterized Felicia Wright as being "more important with this thing that(sic) Mr. Phillips . . . ." 3T94-7/8.

In his summation DeMattia falsely vouched to the jury that with respect to the testimony of Felicia Wright that there "is no testimony that there is anything wrong with her" and that her testimony should be accepted and relied upon by the jury because you cannot "call her a liar if you've got nothing to

support it." 5T52-16/21.

At no point during either the direct or cross examination of Ms. Wright, or at any time during the trial, was it brought out by DeMattia that Ms. Wright at the time she testified had a 2004 open and pending criminal indictment in Morris County. Pa37, ¶ 24.

After the seven-day trial, conducted in March and April 2005, the jury found defendant guilty of all charges. On May 13, 2005, Judge Thomas R. Vena sentenced defendant to a term of thirty years in prison, with thirty years of parole ineligibility, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the murder conviction and a consecutive seven-year term with parole ineligibility for eighty-five percent of that term pursuant to NERA for the conviction for aggravated assault. The court also imposed a concurrent four-year term for the conviction on the third count, unlawful possession of the handgun, and merged the fourth count, possession of the handgun for an unlawful purpose, with counts one and two. Pa08-Pa13.

Miller's direct appeal to the Appellate Division was denied, as were several post-conviction relief motions.

The 20 Year-Long Intentional *Brady* Violation

On or about February 08, 2005, after the death of Investigator Powell, DeMattia and/or Murad requested and received a CCH report regarding Ms. Wright

from the New Jersey State Police. This CCH report reflected that Ms. Wright was the named defendant of an open and then-pending Morris County criminal charge which arose on or about February 25, 2004, when Ms. Wright was arrested by the Morris County Prosecutor's Office on four charges: identity theft, forgery, theft by unlawful taking and hindering prosecution (by giving a false name, LORRECE COOK, when arrested). See Compl. ¶ 70; Pa29-Pa32b.

This Wright CCH report is quintessential *Brady* evidence to which Miller had an absolute right under the Fifth and Fourteenth Amendments to receive; DeMattia illegally, knowingly and intentionally suppressed and concealed the Wright CCH from Miller and the Court. Ms. Wright eventually entered a plea of guilty to the four counts and was sentenced to probation in December, 2009 (which was transferred to Essex County) and thereafter a bench warrant issued against her for violation of probation in May 2011. Id.

Subsequent to the conclusion of Miller's trial in 2005, and through 2023, the individual defendants continually refused to disclose and intentionally and deliberately concealed and suppressed the existence of Wrights' 2005 CCH report. The failure of the individual defendants, over the course of 20 years post-trial, to continue to suppress and not disclose the 2005 Wright CCH report is a Brady/Giglio violation, which violated Mr. Miller's right to a fair trial and due process, because the withheld Brady evidence had a reasonable probability of affecting a judicial

9

proceeding. V, VI, XIV U.S.C.A.

<u>The Department of Justice Investigation and Report on the Illegal/Unconstitutional Conduct of the City of Newark Police Department</u> [5]

Because of numerous civilian misconduct complaints and civil rights lawsuits naming Newark and its police department the United States Department of Justice, in conjunction with the Office of the United States Attorney for New Jersey, in May, 2010 undertook an exhaustive examination of the policies and practices of the Newark Police Department ("NPD")(hereinafter "Report"; attached hereto). In summary the Report concludes that the NPD has routinely violated the civil rights of citizens because of inadequate and defective policy and procedures, with respect to hiring/training/disciplining of its police officer, and that as to then existing policy and procedures these are either not followed/practiced coupled with the fact that the NPD's supervisory personnel has abdicated its responsibility to monitor the rank and file police, such as defendant Muhammad:

**Illegal stops and arrests in violation of the Fourth Amendment.**

---

[5]    The Report is submitted pursuant to Fed. R. Evid. 702 and as an admission by a party opponent and a statement against interest, which estops Newark from objecting to it being admitted since it was a party to the Report and stipulated it was valid in its findings and conclusions.

Approximately 75% of reports of pedestrian stops by NPD officers failed to articulate sufficient legal basis for the stop, despite the NPD policy requiring such justification.

**Racial profiling that results in disproportionate stops and arrests of Newark's black residents.**

The NPD stops black individuals at a greater rate than it stops white individuals. As a result, black individuals in Newark bear the brunt of the NPD's pattern of unconstitutional stops and arrests.

**Retaliating against individuals who question police actions.**

In violation of the First Amendment, NPD officers have detained and arrested individuals who lawfully object to police actions or behave in a way that officers perceive as disrespectful.

**Illegal and unjustified and excessive force in violation of the Fourth Amendment.**

In more than twenty percent of the NPD force incidents reviewed, the force as reported appeared unreasonable and thus in violation of the Constitution.

**Routine Theft of property by NPD officers in violation of the Fourth and Fourteenth Amendments.**

The investigation revealed evidence of the recurring theft of citizens' property and money by officers, specifically in the NPD's specialized units such as the narcotics and gang units, and in the prisoner processing unit at the Green Street Cell Block and the NPD has conducted inadequate investigations into theft complaints and failed to take corrective action against offending officers, Report at

2-3.[6]

The Report identifies, and as is alleged in the Complaint, that the NPD does not have and there never has been provided to the "NPD Officers the tools necessary to support constitutional policing, such as adequate training, clear and easily accessible policies, and meaningful supervisory direction. Basic deficiencies have included the failure to ensure that NPD officers actually have access to the policies they are supposed to follow, to regularly update policies, and to provide or track necessary training. Report at 3.

Moreover NPD's unconstitutional policing practices exist at every level within the Department. Report at 4. Most significantly, the NPD has not contested the findings and conclusions in the Report and has stipulated that the findings are valid and require immediate remedial and corrective action. Id.

As to specific problematic areas, the Report concluded that the "NPD engages in a pattern or practice of effecting pedestrian stops without reasonable suspicion of criminal activity, in violation of the Fourth Amendment. In addition, the NPD's response to perceived disrespect violates the First and Fourth Amendments. Further, a fair number of the NPD's narcotics-related arrests violate the Fourth Amendment." Report at 7.

---

[6]   One astounding example of the deliberate indifference of the NPD is that it sustained only one civilian complaint out of hundreds received from 2007 through 2012. Report at 3.

The Report concludes that although "NPD officers generally write reports that facially appear to establish probable cause to arrest, those reports have reflected two categories of problematic practices. First, there is reasonable cause to believe that the NPD has engaged in a pattern or practice of unconstitutional arrests for behavior perceived as insubordinate or disrespectful to officers— often charged as obstruction of justice, resisting arrest, or disorderly conduct." Report at 11-12.

The Report clearly lays the blame for the systemic deficits and defects in the NPD policing practices at the feet of the NPD supervisory staff, concluding that "the disparate impact of the NPD's stop, search, and arrest practices appears to be an additional harm stemming, at least in part, from the same poor policing practices that result in stops, searches, and arrests that violate the First and Fourth Amendments. Without meaningful supervisory review, this practice increases the opportunity for officers to rely—consciously or unconsciously—on impermissible factors such as an individual's race when conducting law enforcement actions." Report at 19; emphasis added.

In the USE OF FORCE category, the NPD fares no better; the Report states "that the NPD has engaged in a pattern or practice of unconstitutional force in violation of the Fourth Amendment. Relying primarily on officers' own descriptions of and justifications for the force they used, this review found that

more than twenty percent of NPD officers' reported uses of force were unreasonable and thus violated the Constitution." Report at 22; emphasis added.

As to the NPD conduct being illegal, and warranting referral to the Essex County Prosecutor, the Report found that NPD also has mishandled serious use of force incidents that require both criminal and administrative review, including cases where officers have used deadly force. In particular, the NPD often has failed to refer serious use of force cases to the ECPO to be considered for criminal prosecution, and when the NPD has done so, the criminal referral inappropriately has ended the NPD's administrative investigation." Report at 28.

Unbelievably, "NPD's handling of officer-involved shootings has fallen strikingly short of generally accepted police practices. The NPD has not conducted adequate administrative investigations to determine if officer-involved shootings violate NPD policy. Indeed the investigations of all 29 officer-involved shootings between May 2010 and January 2012 were incomplete." Report at 29.

The NPD rank-and-file appears to have engaged routinely in theft of personal property and valuables from arrestees, which thefts are condoned by supervisory staff which has done nothing to address, investigate or curtail such blatant illegal conduct. The evidence makes clear that theft from arrestees has been more than an aberration limited to a few officers or incidents within NPD.

14

Review of this issue was hindered by the deficiencies in IA investigations, as well as NPD's inability to provide all of the documents requested." Report at 32-33.

## **Lastly, the NPD does not have any criteria for officer selection and training into specialized units.**

"The NPD is well aware of this problem  (and) recognizing that inadequate screening has allowed such theft/training) problems to occur, the NPD's Special Investigations Unit recommended a policy of thoroughly reviewing an officer's IA history before assignment to a specialized unit. Despite the clear need for such a policy, the NPD did not act on this recommendation.

Nor has the NPD implemented screening measures to ensure assignment of officers with appropriate and tested integrity to these units. Report at 33.

Perhaps the greatest flaw in the administration of the NPD is that there is no appropriate discipline paradigm in sustained misconduct cases. Report at 41.

In essence defendant Muhammad claims that the "only allegations specific to Defendant Muhammad allege he was the Newark police detective assigned to investigating the underlying murder and wounding and further, that during the investigation, he was the individual who canvassed for people present during the shooting identifying two witnesses, including Ms. Wright. (¶¶ 37-38). There are no

15

other allegations alleging conduct by Defendant Muhammad specifically." DBr. at 4.

With respect to Defendant City of Newark, Plaintiffs allege that the City failed to train its officers "with respect to the proper procedure for honoring and not violating or abridging the Constitutional rights of persons being investigated for having committed a criminal offense" or alternatively, if the City had such a policy.

As to defendants Muhammad and City of Newark's personal involvement in the investigation and prosecution of the case against Mr. Miller, the Complaint clearly sets out that defendant Muhammad (in conjunction with defendant DeMattia, collectively referred to as the "individual defendants"):

1.     Miller's damages also resulted from the failure of Murad and DeMattia, in violation of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States,* 405 U.S. 150 (1972) (collectively "Brady"), to disclose to Miller's trial attorney and the trial Court that these defendants had engaged in wrongful suppression and destruction of evidence favorable to Miller and the fabrication of false evidence prejudicial to Mr. Miller. Complt. ¶ 6;

2.     Soon after the Philips murder and the wounding of Mr. Davis occurred the NPD assigned Defendant Murad and Investigator Ben Powell ("Powell") as the co-chief detectives on the case to launch an investigation, which resulted in two

witnesses being indentified. ¶ 37;

3.       During his investigation Murad and Powell canvassed the people present when the shooting occurred and identified two witnesses: FELICIA WRIGHT ("Wright") and a STACEY DAVIS ("Davis"). ¶ 38;

4.       Formal commencement of the criminal case and prosecution occurred on January 18, 2002, with the filing of a criminal complaint against Mr. Miller which had been prepared, approved and filed by the individual defendants. ¶ 39;

5.       On or about February 08, 2005, after the death of Investigator Powell, the individual defendants requested and received a CCH report regarding Ms. Wright from the New Jersey State Police. ¶ 62;

6.       This CCH report reflected that Ms. Wright was the subject of an open and pending  Morris County criminal charge which arose on or about February 25, 2004, when Ms. Wright was arrested by the Morris County Prosecutor's Office on four charges: identity theft, forgery, theft by unlawful taking and hindering prosecution (by giving a false name, LORRECE COOK, when arrested). ¶ 63;

7.       The individual defendants illegally and unlawfully agreed, conspired and combined to knowingly and intentionally suppress and conceal the Wright CCH from Miller and the Court, because if Miller was aware of it this would of benefit and useful to Mr. Miller. ¶ 65;

8.       Subsequent to conclusion of Miller's trial in 2005, and through 2023,

the individual defendants failed and refused to disclose and continued to intentionally and deliberately conceal and suppress the existence of Wrights' 2005 CCH report. ¶ 69;

9.    The individual defendants' failure to disclose the Morris county criminal matter involving Ms. Wright is a <u>Brady/Giglio</u> violation, which violated Mr. Miller's right to a fair trial and his due process rights, because the withheld Brady evidence had a reasonable probability of affecting a judicial proceeding. V, VI, XIV U.S.C.A. ¶ 70;

10.    The individual defendants uncovered critical evidence by virtue of the receipt of the 2005 Wright CCH report that was of benefit to and to which Mr. Miller was entitled to receive, which should have been disclosed to Miller prior to trial. ¶ 70;

11.    But the individual defendants willfully, deliberately and intentionally disregarded and withheld that evidence in their rush to unjustly convict Mr. Miller. ¶ 71;

12.    Subsequent to the conviction and sentencing of Mr. Miller, and up through 2022, the individual defendants were continually aware of the 2005 Wright CCH report and willfully, deliberately and intentionally disregarded and withheld and suppressed that evidence so as to continually prejudice Mr. Miller. ¶ 73;

13.    The Brady rule  mandates that a State prosecutor and/or investigating police officer, such as the individual defendants, has a continuing duty, even after trial, conviction and sentencing, to disclose evidence favorable to accused which was not timely produced prior to or at trial because the withheld Brady evidence had a reasonable probability of affecting a judicial proceeding. ¶ 74;

14.    At all relevant times the NPD did not have a policy which instructs a detective such as Muhammad that relevant Brady information must be disclosed to a defendant prior to trial, even if it is exculpatory. ¶ 81;

15.     At all relevant times the NPD did not have a policy which informs a detective such as Murad that they may not withhold Brady evidence from a defendant, even if it is exculpatory. ¶ 82;

16.    At all relevant times the NPD did not provide a detective such as Murad any training regarding the obligation of detectives to disclose Brady evidence to a defendant, even if it is exculpatory. ¶ 83;

17.    At all relevant times the NPD did not inform a detective such as Murad during training that they may not withhold Brady evidence from a defendant and that a detective is obligated even post-trial to disclose the existence of Brady evidence not timely disclosed. ¶ 84;

18.    The actions and conduct of the individual defendants herein were intentionally, deliberately and in bad faith undertaken. ¶ 89.

No answer to the complaint has been filed by either defendants Muhammad or Defendant City of Newark and discovery has been stayed in total.

<u>The Rule 12 (b) Motion to Dismiss</u>

Defendant Muhammad in his Rule 12 motion claims there are two reasons to dismiss the complaint against him:

"The Complaint must be dismissed as a matter of law because the bare and conclusory allegations do not demonstrate with any plausibility that Defendant Muhammad engaged in conduct that could give rise to liability on any of the constitutional claims asserted against the City Defendants. The only factual assertions that allege conduct by Defendant Muhammad specifically, allege only that: Muhammad was assigned as a 'co-chief' of the underlying criminal investigation (¶ 37); and he canvassed the people present for the shooting and identified two witnesses (¶ 38). Invariably, these are the only specific allegations of conduct by Defendant Muhammad and appear to describe only proper conduct by an investigating police officer." DBr. at 7-8.

Secondly, Muhammad claims he should be dismissed as a defendant under the qualified immunity doctrine, See DBr, at 10-13.

Both contentions should be rejected by this Court.

In its Rule 12(b) motion the City of Newark argues that it has no liability under Monell because the

"Complaint at issue here lacks allegations sufficient to state a *Monell* claim against the City under the Federal pleading standards. Preliminarily, Plaintiffs have not even alleged a constitutional violation by the City Defendants and for that reason alone, the claim should fail as a matter of law. That is, when analyzing Plaintiffs' affirmative *Monell* claim – *i.e.,* that the City had implemented inadequate policies relating to a police officer's *Brady* obligations – the claim fails because there are simply no factual allegations to support this claim at all. This failure amounts to Plaintiff's inability to demonstrate a claim under the standards set forth in *Iqbal, Twombly*, and *Fowler*.

20

Plaintiffs' failure-to-train theory of the *Monell* claim likewise fails because the Complaint asserts only a formulaic recitation of the elements of the claim. Plaintiff does not point to a single fact that could plausibly demonstrate the City's policy with regard to police officers' *Brady* obligations were inadequate or that the City acted with deliberate indifference to his *Brady* rights. This, too, amounts to a failure to meet the pleading standards under the dominating case law." DBr. at 19-20.

STANDARD OF ADJUDICATION

In considering a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all factual allegations as true [and] construe[s] the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks and citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

The Court in Iqbal explained that, although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. Id. at 678, 684. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555); see also Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (citing Twombly, 550 U.S. at 556 n.3) ("We caution

that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests.").

Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that  allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

In other words in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting Twombly, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. Garrett v. Wexford Health, 938 F.3d 69, 92 (3d Cir. 2019) (quoting Iqbal, 556 U.S. at 678−79).

To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations

"plausibly give rise to an entitlement to conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." <u>Bistrian v. Levi</u>, 696 F.3d 352, 365 (3d Cir. 2012).

<u>LEGAL ARGUMENT</u>

<u>POINT I</u>

DEFENDANT MUHAMMAD OBTAINED THE 2005 WRIGHT
<u>CCH REPORT AND IS NOT ENTITLED TO QUALIFIED IMMUNITY</u>

At the outset, it is important to note that defendant Muhammad knew, or should have known as to the existence of the 2005 Wright CCH report when it was procured based on the complaint clearly alleging that it was Muhammad who ordered and received the Wright CCH report; neither defendant Muhammad nor codefendant DeMattia has made a statement in this regard.

However, Muhammad was the lead case officer whose responsibilities included, in part, procuring the criminal history of each witness to testify on behalf of the State. At this point, as no answer has been filed and no discovery has been obtained and discovery has been stayed, it appears the defendant Muhammad's Rule 12 motion is at best premature.

Non-judicial officials, such as police officers, are entitled only to qualified immunity.

Defendant Muhammad asserts he is entitled to qualified immunity.

The doctrine of qualified immunity shields government officials from personal liability in Section 1983 cases where their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." George v. Rehiel, 738 F.3d 562, 572 (3d Cir. 2013) (citation and quotation marks omitted).

Courts must engage in a two-part inquiry to determine whether qualified immunity applies:

"(1) whether the allegations, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right; and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation." Gould v. O'Neal, No. 17-100, 2022 WL 354663, at *5 (D.N.J. Feb. 7, 2022) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236 (receding from Saucier v. Katz, 533 U.S.194 (1998), which mandated that the two prongs be answered sequentially).

Even if a constitutional violation had occurred, the Court must ascertain whether a right at the time the violation occurred was "clearly established," which

requires the Court to conduct a two-part inquiry. Peroza-Benitez v. Smith, 994 F.3d 157, 165 (3d Cir. 2021).

First, courts must "define the right allegedly violated at the appropriate level of specificity." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012). Second, courts must ask whether that right was "clearly established" at the time of its alleged violation, such that the right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Kisela, 584 U.S. at 104 (quotation marks omitted).

Qualified immunity accordingly protects "all but the plainly incompetent or those who knowingly violate the law." Id. (quotation marks omitted).

Qualified immunity shields officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Dennis v. City of Philadelphia, 19 F.4th 279, 287 (3d Cir. 2021) (citations omitted); Xi v. Haugen, 68 F.4th 824, 839 (3d Cir. 2023).

Thus, it ceases to apply only when (1) a "plaintiff sufficiently allege[s] the violation of a constitutional right," and (2) that "right was 'clearly established' at the time of the official's conduct." Dennis, 19 F.4th at 287.

Municipal liability under Section 1983 requires an underlying constitutional violation. Ford v. County of Hudson, 729 F. App'x 188, 196 n.4 (3d Cir. 2018) (; Commonwealth of Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482(3d Cir. 2003)); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).

An award of qualified immunity protects a government official from civil liability "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982); Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508  (2002).

This inquiry is limited to the law at the time of the incident, as "an official could not be reasonably expected to anticipate subsequent legal developments." Harlow, 457 U.S. at 818. To overcome a defendant's claim of qualified immunity, the court must determine: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S. Ct. 2074  (2011) (cleaned up); see also Williams v. Sec'y Pa. Dep't of Corr., 848 F.3d 549, 557 (3d Cir. 2017) ("We first determine whether a right has been violated. If it has, we then must decide if the right at issue was clearly established when violated

such that it would have been clear to a reasonable person that her conduct was unlawful.").

Pursuant to the Supreme Court's explanation in Pearson v. Callahan, those inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address. See 555 U.S. 223, 236, 129 S. Ct. 808 (2009). The defendant official is entitled to qualified immunity if either prong is not satisfied. See id. at 244-45.

For purposes of qualified immunity, however, "the right must be defined beyond a high level of generality," Thomas v. City of Harrisburg, 88 F.4th 275, 284 (3d Cir. 2023), but there need not be "a case directly on point for a right to be clearly established." Id. (citing Rivas-Villegas v. Cortesluna, 595 U.S. 1, 142 S. Ct. 4, 7-8, 211 L. Ed. 2d 164 (2021)).

In order for the right to be clearly established, however, ""[then-]existing precedent must have placed the . . . constitutional question beyond debate." al-Kidd, 563 U.S. at 741; see also Dist. of Columbia v. Wesby, 583 U.S. 48, 63, 138 S. Ct. 577 (2018). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19.

For qualified-immunity purposes, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust

27

consensus of cases of persuasive authority in the Courts of Appeals.'" Bland v. City of Newark, 900 F.3d 77, 84 (3d Cir. 2018) (citation omitted); see Wesby, 583 U.S. at 63 (to be clearly established, a legal principle must "be dictated by controlling authority or a robust consensus of cases of persuasive authority").

In Brady v. Maryland, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process." 373 U.S. 83, 87, 83 S. Ct. 1194 (1963). This duty to disclose applies "irrespective of the good faith or bad faith of the prosecution." Id. The Supreme Court has held that the duty to disclose such evidence is applicable even though there has been no request by the accused. United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). The Supreme Court has also held that the duty encompasses impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

The right at issue is Mr. Miller's right at the time of his trial in 2005 to have Muhammad turn over the 2005 Wright CCH Report as Brady material. In Gibson v. Superintendent of N.J. Dep't of Law and Public Safety, 411 F.3d 427, 443 (3d Cir. 2005), the Third Circuit held that "police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor" ("Although Brady places the ultimate duty of disclosure on the

prosecutor, it would be anomalous to say that police officers are not liable when they affirmatively conceal material evidence from the prosecutor."). Thus, the Third Circuit joined numerous other circuits in recognizing that a plaintiff states "an actionable § 1983 claim" against police officers for interference with his Fourteenth Amendment rights by alleging that the police officers failed to disclose material exculpatory information to the prosecutor. Id.

In addressing qualified immunity, the court in Gibson relied on <u>Kyles</u>, supra, and squarely held that a police officer's duty to inform the prosecutor of Brady material was not clearly established at the time of Gibson's conviction in 1994. Id. at 444, overruled on other grounds by <u>Dique v. N.J. State Police</u>, 603 F.3d 181, 188 (3d Cir. 2010). Thus, the officer defendants in Gibson were entitled to qualified immunity with regard to their failure to inform the prosecutor of the Brady material.

The Third Circuit explained its reasoning as follows:

Although this Court held in <u>United States v. Perdomo</u>, 929 F.2d 967, 970 (3d Cir. 1991), that evidence in the hands of the police could be imputed to the prosecutor, the Supreme Court did not settle this matter until 1995 when it decided <u>Kyles v. Whitley,</u> 514 U.S. at 437, 115 S. Ct. 1555 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). More importantly,

the related duty of the police to disclose information to the prosecutor was not widely addressed until later. Even in 2000, this Court was only able to assume that police officers "have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists." Smith v. Holtz, 210 F.3d 186, 197 n. 14 (3d Cir. 2000).

This Court is bound by the Third Circuit's decision in Gibson in deciding whether the right at issue was clearly established and whether Officer Muhammad is entitled to qualified immunity.

Courts in this circuit have continued to apply Gibson when assessing qualified immunity for Brady claims. See Kamienski v. Ford, 844 F. App'x. 520, 524 (3d Cir. 2021) (relying on Gibson and finding that the investigators were entitled to qualified immunity for their conduct at the time of the 1988 trial).

Because, at this point, there is no evidence as to who ordered and obtained the 2005 Wright CCH report, and who placed it in the case file, there is no basis for defendant Muhammad's Rule 12 motion.

POINT II

THE CITY OF NEWARK IS LIABLE TO
THE PLAINTIFF UNDER *MONELL*

The gravamen of Newark's argument underlying its Rule 12 motion to dismiss Count IV is that:

"the Complaint at issue here lacks allegations sufficient to state a *Monell* claim against the City under the Federal pleading standards. Preliminarily, Plaintiffs have not even alleged a constitutional violation by the City Defendants and for that reason alone, the claim should fail as a matter of law. That is, when analyzing Plaintiffs' affirmative *Monell* claim – *i.e.,* that the City had implemented inadequate policies relating to a police officer's *Brady* obligations – the claim fails because there are simply no factual allegations to support this claim at all. This failure amounts to Plaintiff's inability to demonstrate a claim under the standards set forth in *Iqbal, Twombly*, and *Fowler*.

Plaintiffs' failure-to-train theory of the *Monell* claim likewise fails because the Complaint asserts only a formulaic recitation of the elements of the claim. Plaintiff does not point to a single fact that could plausibly demonstrate the City's policy with regard to police officers' *Brady* obligations were inadequate or that the City acted with deliberate indifference to his *Brady* rights. This, too, amounts to a failure to meet the pleading standards under the dominating case law.

For these reasons, Plaintiffs' claims for municipal liability against the City fail, and should accordingly be dismissed." DBr. at 19-20.

Ordinarily a municipality cannot be held liable for the unconstitutional acts of its employees <u>solely</u> on a theory of *respondeat superior,* except where the plaintiff's Constitutional right was violated as the result of the municipality's policy or custom, which is one of branches pleaded in the complaint against Newark. See <u>Monell, supra</u> 436 U.S. at 691 (A plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by and the direct result of the municipality's policy or custom.).

Liability is imposed only "when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees."

Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir.1991) (quoting

Polk Cnty. v. Dodson, 454 U.S. 312, 326, 102 S.Ct. 445 (1981)).

At the outset, it is beyond cavil that based on the Report there is virtually

no phase of the NPD operations existing in 2005 which was not rife with wide-

spread illegal and unconstitutional conduct by the rank and file officers, such as

defendant Muhammad, and which were condoned if not facilitated by the NPD

supervisory staff.

"[T]here are two theories of supervisory liability,' one under which

supervisors can be liable if they 'established and maintained a policy, practice

or custom which directly caused [the] constitutional harm,' and another under

which they can be liable if they 'participated in violating plaintiff's rights,

directed others to violate them, or, as the person[s] in charge, had knowledge of

and acquiesced in [their] subordinates' violations." Santiago v. Warminster

Twp., 629 F.3d 121, 129 n. 5 (3d Cir. 2010).

"[L]iability for failure to train subordinate officers will lie where a

constitutional violation results from 'deliberate indifference to the constitutional

rights of [the municipality's] inhabitants.'" Groman v. Township of Manalapan,

47 F.3d 628, 637 (3d Cir. 1995) (quoting City of Canton, Ohio v. Harris, 489

U.S. 378, 392 (1989)); see also City of Oklahoma City v. Tuttle, 471 U.S. 808,

823-24 (1985) (plurality opinion) (holding that evidence of a single incident of

shooting by police could not establish a municipal policy of inadequate training); Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir.2001) (plaintiff "must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference"); Woloszyn v. County of Lawrence, 396 F.3d 314, 324-25 (3d Cir. 2005) (discussing failure-to-train standard in case involving suicide by pre-trial detainee).

The deliberate indifference test also applies to claims of "negligent supervision and failure to investigate." Groman, 47 F.3d at 637.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v.Thompson, 131 S. Ct. 1350, 1360 (2011) (quoting Board of County Com'rs of Bryan County v. Brown, 520 U.S. 397, 409 (1997)); see also Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004) ("A plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact  This typically requires proof of  a pattern of underlying constitutional violations .

It is possible to establish deliberate indifference in the absence **of** such a

33

pattern. Mann v. Palmerton Area School District, 872 F.3d 165, 175 (3d Cir. 2017) (holding that a school district could not be held liable for failure to train football coaches about concussions because there was "no evidence of a pattern of recurring head injuries" in the football program, and finding it significant that state law did not mandate concussion training for coaches until after the events at issue).

Thus, for example, evidence of prior complaints and of inadequate procedures for investigating such complaints can suffice to create a jury question concerning municipal liability. See Beck, 89 F.3d at 974-76. Additionally, "a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body- whether or not that body had taken similar action in the past or intended to do so in the future-because even a single decision by such a body unquestionably constitutes an act of official government policy." Pembaur v. City of Cincinnati, 475 U..S. 469, 480, 106 S.Ct. 1292 (1986) ; accord Langford v. City of Atl. City, 235 F.3d 845, 848 (3d Cir. 2000). The Third Circuit has reiterated that "[t]he Supreme Court's decision in Pembaur makes clear that an official with policymaking authority can create official policy, even by rendering a single decision." McGreevy v. Stroup, 413 F.3d 359, 367-68 (3d Cir. 2005).

Municipal liability may be imposed based upon a single decision "where

the decision-maker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur, 475 U.S. at 481, 106 S.Ct. 1292. " '[A]n official has final policy-making authority, and can thus bind the municipality by his conduct' if 'the official is responsible for making policy in the particular area of municipal business in question' and 'the official's authority to make policy in that area is final and unreviewable.' "Ecotone Farm LLC v. Ward, 639 Fed.Appx. 118, 128 (3d Cir. 2016).

In a "narrow range" of cases, Connick, 131 S. Ct. at 1366, deliberate indifference can be shown even absent a pattern of prior violations by demonstrating that a constitutional violation was sufficiently foreseeable: "[I]t may happen that in light of the  duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489  U.S. at 390.

In a post-Connick case, Thomas v. Cumberland County, 749 F.3d 217 (3d Cir. 2014), the court of appeals found the evidence sufficient for the claim to go to a jury under this standard. It held that "a reasonable jury could conclude based on the frequency of fights and the volatile nature of the prison" that the county was deliberately indifferent based on its failure to provide training in

conflict de-escalation."

The Third Circuit has previously applied a three-part test to determine whether "a municipality's failure to train or supervise to amount[s] to deliberate indifference": Under this test, "it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999).

With respect to the Count IV claim for Newark's 1983 liability inadequate employment screening and/or training during employment can form the basis for municipal liability, the Supreme Court has indicated that the deliberate indifference test must be applied in this context.

"Where the plaintiff claims "that a single facially lawful hiring decision launch[ed] a series of events that ultimately cause[d] a violation of federal rights .... , rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 405 (1997).

In Brown, the Court held that the fact that a county sheriff hired his

nephew's son as a reserve deputy sheriff without an adequate background check did not establish municipal liability for the reserve deputy sheriff's use of excessive force. The Court indicated that one relevant factor was that the claim focused on a single hiring decision:

Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decision-maker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause. Id. at 408-09.

The Court also drew a distinction between inadequate training cases and inadequate screening cases, but nonetheless held that a plaintiff may succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations.

In certain cases a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific

training/tools to handle recurring situations.

The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice - namely, a violation of a specific constitutional or statutory right.

The high degree of predictability may also support an inference of causation - that the municipality's indifference led directly to the very consequence that was so predictable.

Where a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicant's record, however, a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself but the official's failure to adequately scrutinize the applicant's background which would constitute "deliberate indifference." Id. at 411; see id. at 412 ("[A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff.") Id.

Most importantly, a municipality is liable under 1983 if it tolerates known illegal conduct by its employees. Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996).

In such circumstances, having a custom which is deliberately indifferent to the rights of its citizens, such as Mr. Miller, will be presumed where the (1) policymakers were aware that municipal employees had deprived others of certain constitutional rights; (2) it failed to take precautions against future violations; and (3) this failure led, at least in part, to the plaintiff suffering the same deprivation of rights. See id. (citing Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990)).

The complaint alleges a failure by the City to properly train and supervise the police officers in discharging their policing duties.

In resolving the issue of a city's liability for the alleged failure to train, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." City of Canton v. Harris, 489 U.S. 378, 390 (1989).

The identified deficiency in a city's training program must also be closely related to the plaintiff's constitutional injury because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city

39

'could have done' to prevent the unfortunate incident." Id. at 392 (citation omitted).

Thus, Plaintiffs' claim impels liability against Newark where Plaintiff can show that the City's failure-to-train constituted deliberate indifference to the constitutional rights of its citizens. See id. (citing Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990))

Plaintiffs herein clearly articulate municipal liability based upon a failure to: (1) Train; (2) Supervise, (3) Monitor/Investigate, and (4) Discipline.

It is well recognized that municipalities may be liable under 1983 for a failure to train its police and/or failure to properly supervise/monitor police conduct. See, e.g., Hammock v. Borough of Upper Darby, No. 06-1006, 2007 WL 3232115 at *8 (E.D. Pa. Oct. 31, 2007) (describing the inquiry as "whether [the defendant's] internal investigatory and disciplinary procedures constituted a municipal policy of deliberate indifference toward the risks of police misconduct, and whether adherence to that policy proximately caused [the plaintiff's]constitutional injuries.").

Whether this custom in fact existed and, secondly, had such an effect in the present case is an issue of disputed fact that precludes the entry of an order of dismissal. Id.

In any event, there can be no dispute that the § 1983 claims of the plaintiff

are self-proving, based upon the Complaint, the Report and the related Consent Decree, <u>stipulated to by Newark</u>, which estop Newark's arguments to the contrary.[7]

<u>CONCLUSION</u>

WHEREFORE, based upon the facts and argument hereinabove presented Plaintiff NAEEM MILLER prays the Court to deny in all respects the Rule 12(b) motion of Defendants MURAD MUHAMMAD and the CITY OF NEWARK, NEW JERSEY for an order dismissing the complaint.[8]

Respectfully submitted,

FREEMAN & PATEL, LLC.
ATTORNEYS FOR PLAINTIFFS

By:

*Jarred Freeman*

JARRED S. FREEMAN, ESQ.

C:    Victor A. Afanador, Esq.

---

[7]    It is respectfully submitted the Court may wish to *sua sponte* consider application of sanctions to defendant City of Newark for its obviously intentional concealment with *scienter* of the DOJ Report, thereby permitting its attorneys to falsely argue in the Rule 12 motion that there are no facts existing to prove the Count IV claim herein.

[8]    Plaintiffs request that in the event that the defendants' motion is granted in whole or in part that plaintiffs be afforded a 30 day window within which to file an amended complaint.